**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON**

**CIVIL ACTION NO. 2:17-cv-113 (WOB-CJS)**

**MAUREEN HOLLIDAY**                                                  **PLAINTIFF**

**VS.**                    **MEMORANDUM OPINION AND ORDER**

**ALECIA LEIGH, ET AL.**                                          **DEFENDANTS**

This is the second § 1983 action of its kind filed with this Court involving allegations that social workers for the Kentucky Cabinet for Health and Family Services ("CHFS") coerced a mother into signing a restrictive Prevention Plan without reasonable cause to believe that the child was in immediate danger and then maintained the Plan's restrictions in the face of compelling evidence that the child was safe. *See Schulkers v. Kammer,* 955 F.3d 520 (6th Cir. 2020); *Schulkers v. Kammer,* 367 F. Supp. 3d 626, (E.D. Ky. 2019).

This case is now before the Court on defendants' motions for summary judgment seeking the dismissal of Holliday's claims that defendants violated her Fourteenth Amendment procedural and substantive due process rights to family integrity; her claims for intentional infliction of emotional distress; and her claim for

punitive damages. (*See* Docs. 39, 40). For the reasons below, defendants' motions will be **GRANTED IN PART AND DENIED IN PART**.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

At the relevant time, plaintiff Maureen Holliday was the thirty-year-old single mother to her daughter AH, age three. On October 13, 2016, Holliday dropped AH off at daycare. Holliday contends that one of the other children at daycare, Lola, bit AH on her backside while they were playing a game in the daycare's gym. (Doc. 42-3, at 50-52, 54). AH neither complained to the staff about the bite nor told Holliday about the incident when she picked her up that day. (*Id.* at 50-52).

That evening, AH attended a family dinner hosted by Holliday's grandmother, Phyllis Walz. Several of Holliday's other family members attended the dinner, but Holliday was ill, so she stayed home and allowed AH to spend the night at Walz's house. (*Id.*). The next morning, on Friday October 14, 2016, Walz was bathing AH and noticed a bruise that resembled a bite mark on her backside. (*Id.*). When Walz asked AH how she got the bruise, AH said that Lola had bitten her at daycare. (*Id.*) When Walz called Holliday to tell her about the bite mark, Holliday asked her to report it to the daycare staff and to ask whether they had completed an incident report. (*Id.*).

As instructed, Walz reported AH's bite mark to a daycare supervisor that morning when she dropped AH off. AH showed the

supervisor the bite mark and told her that Lola had bitten her the previous day. (Doc. 30-4, at 5). Nevertheless, a daycare worker reported the bite mark to CHFS, stating that AH had bruises across the middle of her buttocks and that the bite mark did not look like it came from a child. (*Id.*). Because AH was under four, her case was automatically considered high risk and a social worker was assigned to investigate. (Doc. 30-2, at 20).

Later that afternoon, the daycare's director called Holliday to let her know that a CHFS social worker was at the daycare. Holliday rushed from work to the daycare, where she met defendant Alicia Leigh. Leigh had already interviewed AH, and AH had told Leigh that Lola had bitten her. (Doc. 42-1, at 11). AH was, however, fuzzy on the details and also reported that she occasionally got spanked, allegedly telling Leigh that it "left a blue mark like the [pen] [Leigh] was writing with at the time." (*Id.* at 10-11). Leigh asked more questions but eventually stopped the interview because AH was having trouble understanding the questions and was providing mostly nonsensical responses. (*See* Doc. 30-4, at 17-18).

When Holliday arrived, Leigh prevented her from seeing AH and insisted upon interviewing Holliday alone in another room. (Doc. 42-3, at 57, 72). Holliday asked that someone from the daycare be present, but Leigh refused. (*Id.* at 57). Once alone in the room, Holliday told Leigh that she learned of AH's bite mark from Walz.

3

Leigh then questioned Holliday about how she disciplined AH, and Holliday explained that she used time outs and occasionally smacked her hand or spanked her over her clothing with her hand but emphasized that she never left a mark on AH. (*Id.* at 172-73).

### a.  The Prevention Plan

Leigh next told Holliday that she was under a Prevention Plan and informed her that she was limited to "supervised contact with AH until notified by CHFS," meaning that any contact with AH would be permitted only when an approved supervisor was present. (Doc. 42-3, at 58, 247). The Plan precluded anyone who had access to AH within the past forty-eight hours from supervising Holliday's contact with AH. Because of the family gathering the night before, this requirement prevented much of Holliday's family from supervising Holliday or watching AH. (*Id.*). Finally, the Plan required Holliday to take AH to Cincinnati Children's Hospital to have doctors assess the bruising and check for any other injuries. (*Id.*).

Leigh handwrote these conditions on a one-page document labeled "Prevention Plan." (*Id.*). The document did not indicate that consent was voluntary, nor did it contain instructions about what to do if Holliday could not comply with the Plan's terms. (*Id.*). The document did, however, include a stamp at the bottom, in all capital lettering, which read: "ABSENT EFFECTIVE PREVENTATIVE SERVICES, PLACEMENT IN FOSTER CARE IS THE PLANNED

4

ARRANGEMENT FOR THIS CHILD." (*Id.*). And under the heading, "Potential Consequences if the Prevention Plan is not successful," Leigh wrote: "Court Action/Foster Care." (Doc. 42-3, at 247). But as defendants admit, they had no planned foster care arrangement for AH. (Doc. 30-1; Doc. 30-2, at 51; Doc. 42-1, at 31, 33).

Leigh signed the Prevention Plan and presented it to Holliday for her signature. Holliday refused. (Doc. 42-3 at 71-72). Holliday testified that she told Leigh that the Plan was ridiculous because AH was bitten by another child and that they were the ones that notified the daycare of the bite. (*Id.*). Holliday says she repeatedly told Leigh that she did not want to, and was not going to, sign the Plan. (*Id.*). Holliday testified that, in response to her refusal, Leigh told her that if she did not sign the Plan then she would take AH into immediate custody. (*Id.* at 81-82). Barred from seeing AH and faced with Leigh's threat to immediately take her, Holliday signed the Prevention Plan. (*Id.* at 69-72, 81-82).

### b. Children's Hospital

The Plan limited Holliday to supervised contact with AH and prevented her family from helping, which made the task of having AH evaluated at Children's Hospital difficult. While still at the daycare, Holliday phoned her grandmother, Walz, and advised her of the situation. After learning that Walz and other family members could not help and having been told by Leigh to "figure it out," Holliday called her cousin, Kim Reed. (*Id.* at 80, 101-02). Reed

hurried from work, but by the time she arrived at the daycare it was past 5:00 p.m., and Leigh had left because she does not work past five. (*Id.* at 122-24). Holliday called Leigh to make sure Reed was approved, but Leigh neither answered nor returned Holliday's voice messages. (Doc. 42-1, at 28-29; Doc. 42-3, at 80).

Though Reed had not been officially approved as a supervisor, she accompanied Holliday and AH to Children's Hospital. There, multiple doctors, other medical staff, and a social worker examined AH. (*See* Doc. 44-1, at 1, 12). Holliday claims that the doctors and staff were confused as to why she had brought AH to the Emergency Room for such faint bruising. (Doc. 42-3, at 205-06). AH's discharge notes state that:

> AH was seen and evaluated [by] the emergency department. She explained to me that she was "bitten on the butt" by her friend Lola. **My exam was consistent with bite marks on both butt cheeks. The marks were simply minor bruises and no puncture marks.** There were no other injuries noted. **AH otherwise appears to be a healthy and happy child.**

(Doc. 44-1, at 26). (emphasis added).

That same night, Leigh phoned Children's Hospital and a hospital employee told her that:

> **There are no concerns with the mark** and they can't say if the marks are bite marks or not because **the bruises are faint** and if **the child reported that another child bit her it was likely that this is how the injury occurred.**

(Doc. 42-8, at 19; *see also* Doc. 44-1, at 12-13) (emphasis added).

6

Notes from a hospital social worker also indicated that there were no concerns and that there was no further social worker intervention needed. (Doc. 44-1, at 12-13, 16).

After Leigh confirmed that medical staff at Children's had no concerns, Leigh consulted with her supervisor defendant Danielle Sneed. (Doc. 42-8, at 19). Though AH had told Leigh that Lola had bitten her during the one-on-one interview, and doctors and another social worker had expressed no concerns, Leigh and Sneed decided to continue their investigation and keep Holliday under the restrictions due to their concern that AH had been coached to tell the hospital staff that Lola had bitten her. (Doc. 42-1, at 26).

Over the course of the weekend, October 14-16, 2016, Reed and Holliday called Leigh to report the results of AH's hospital evaluation. Though Leigh had spoken with the hospital's social worker and knew there were no concerns, she declined to respond. (Doc. 42-8, at 19). With no response from Leigh, Holliday was forced to move out of her home in Florence, Kentucky, and onto Reed's couch in Amelia, Ohio. (Doc. 43, at 10; supported by Holliday Affidavit [43-1]).

On Monday, October 17, Reed's husband drove AH to daycare with Holliday following. (*Id.*) At around 10:00 that morning, Leigh responded to Holliday's voicemails and made clear that she does not work after 5:00 p.m. or on weekends. (Doc. 42-3, at 123-24; Doc. 42-8, at 19). She also told Holliday that the Prevention Plan

would remain in effect despite the doctors and a social worker from Children's Hospital having no concerns.

That afternoon, Leigh continued her investigation. (Doc. 42-8, at 19-22). First, Leigh interviewed Walz, who told her that she had no concerns regarding Holliday's parenting. (*Id.* at 20). Next, Leigh went to the daycare, where she interviewed several employees. (*Id.* at 20-22). While one of the employees reported "that the mark [did] not resemble a bite mark," none of them had any concerns about AH or Holliday. (*Id.*). Leigh also learned that Lola was not an imaginary person. (*Id.*). She attempted to interview her, but stopped the interview because Lola was shy and refused to speak. (*Id.* at 21). Leigh then drove to Holliday's home to interview her again. (*Id.* at 22). She also interviewed her neighbor, who expressed no concerns regarding AH or Holliday. (*Id.*).

### c. Ongoing Investigation

But Leigh was persistent. On October 18, she spoke with Sneed, and they again decided to continue the investigation. (*Id.* at 22). The next day, Leigh returned to the daycare where she attempted to interview several three-year-old children. (*Id.* at 22-23). None of the students revealed negative information. (*Id.*). The first child reported that she liked everything about her teachers, the second reported that teachers were always present, and the third "was crying and would not talk." (*Id.*). Leigh did, however, interview another daycare employee, who like everyone else at the daycare,

said that she had no concerns. (*Id.*).

Leigh then obtained a second opinion regarding AH's bruises from Dr. Shapiro, a child-abuse specialist at the Mayerson Center whom CHFS had consulted in the past. (*Id.* at 23). CHFS provided Dr. Shapiro with photos of AH, but he neither met nor examined her. (*Id.*). Dr. Shapiro reviewed the photos and allegedly told Leigh during a phone conversation that the photos from Children's Hospital "show[] a bite mark on the right bottom cheek and the left bottom cheek shows multiple marks but cannot say if they are bite marks or not." (*Id.*). Leigh and Sneed continued to discuss the case, and Leigh noted that she intended to interview those present at the family dinner. (*Id.*).

On October 24, 2016, Leigh went to two different schools and interviewed two of Holliday's minor relatives who had attended the family dinner: JW, age 13, and BW, age 9. (*Id.* at 23-24). Neither child revealed information that suggested AH had been abused. (*Id.*). That same day, social worker Kelsey Tucker interviewed Paula Tobergate, Holliday's aunt, and Tyrone Patel, Holliday's boyfriend. Neither Tobergate nor Patel expressed concerns regarding abuse. (*Id.*). After Leigh consulted with Sneed on October 26, 2016, Sneed advised Leigh to lift Holliday's supervised contact restriction. (*Id.* at 26). From October 14 to October 28, 2016, the Plan's restrictions had forced Holliday and AH to live in three different homes and had prevented them from visiting with most of

their family absent supervision. (Doc. 43, at 11).

On October 28, 2016, a different CHFS worker presented Holliday with a second Prevention Plan. (Doc. 42-3, at 108). There was once again a stamped notice which stated that foster care was the planned arrangement for the child. (*Id.*). This Plan differed in that it limited only the family members present at the dinner to supervised contact with AH. (*Id.*). The new Plan still prevented Holliday's family from helping with AH's care while Holliday worked two jobs and attended her college social work classes. (Doc. 43, at 11).

Leigh interviewed more of Holliday's family, friends, and other daycare employees from October 26 to November 15, 2016, and no one expressed concerns that AH had been abused. (Doc. 42-8, at 26-27). Holliday continued to call Leigh, asking that she be released from the Prevention Plan. (Doc. 42-3, at 138; Doc. 43, at 12). But defendants kept the restrictions in place despite Leigh conducting no additional interviews from November 15 through December 27, 2016, and Holliday's repeated requests for relief. (*See* Doc. 42-3, at 138; Doc. 42-8, at 27-28).

As Leigh explained to Holliday, CHFS had to complete its investigation before she could be released from the Prevention Plan, and it had not yet done so. (Doc. 43, at 12). Between October 26, and December 27, 2016, Leigh placed multiple calls to Dr. Shapiro's office at the Mayerson Center, requesting that his

opinion be reduced to writing. (Doc. 42-8, at 27-28). Holliday testified that she was never told that the social workers were waiting for a written opinion from Dr. Shapiro and testified that she would have taken AH to the clinic herself had she known. (Doc. 42-3, at 67, 138, 141, 149). On December 27, 2016, a staff member from the Mayerson Center reported to Leigh via e-mail that:

> Dr. Shapiro as well as other doctors in the Mayerson Center are no longer allowed to consult on cases or follow up on cases unless the child has been seen by them in the office. Heidi reported that **what the ER reported to CHFS would be the standing explanation** due to this.

(*Id.* at 28). (emphasis added). Later that day, Leigh and Sneed concluded they would close Holliday's case and mark it as unsubstantiated. (*Id.* at 30). The case was officially closed on January 4, 2017. (Doc. 30-2, at 83). But Holliday was not notified of the decision. (*See id.* at 83-85).

Finally, on January 13, 2017, almost three months after Leigh's first visit to the daycare, Leigh told Holliday that the CHFS had closed the case against her because the investigation revealed no evidence of abuse by a caretaker. (*Id.* at 83; *see also* Doc. 42-8, at 30-31). In the closing documents, Leigh reported under the heading "Incident Results" that "Child presented with injuries to both buttocks—round mark which could be bite mark on one buttock and a *linear mark* on the other per Dr. Shapiro." (Doc. 42-8, at 30) (emphasis added). The term "linear mark" is apparently

indicative of someone committing an intentional abusive act. (*See id.*)*.* That term, however, is found only in Leigh's final summaries and is absent from her initial, contemporaneous summary of her October phone call with Dr. Shapiro. (*Compare* Doc. 42-8, at 23, *with* Doc. 42-8, at 29-30).

## II. **ANALYSIS**

In evaluating Holliday's claims, the Court views the facts in a light most favorable to Holliday as the nonmovant. *Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).

### A.   **Substantive & Procedural Due Process Claims**

Defendant social workers are employed by the Commonwealth of Kentucky, which is immune from suit in federal court under the Eleventh Amendment. But Holliday can sue state actors such as these defendants in their individual capacities under 42 U.S.C. § 1983 if they violated her federally protected constitutional rights and are not entitled to qualified immunity.

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Accordingly, this Court must decide whether the CHFS defendants

violated Holliday's substantive and procedural due process rights and, if so, whether those rights were clearly established "beyond debate."

Before turning to the merits of the qualified immunity defense, it is worth addressing defendant Sneed's argument that as a supervisor she cannot be held liable under § 1983 on the theory of respondeat superior. While true, *see Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009), a § 1983 plaintiff need only show that a supervisory official implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending subordinate. *See, e.g., Coley v. Lucas Cty.*, 799 F.3d 530, 542 (6th Cir. 2015.

Sneed authorized or knowingly acquiesced to the alleged deprivation of Holliday's constitutional rights. While it appears Sneed had no involvement in Leigh's allegedly coercive behavior when the Plan was first signed, Leigh and Sneed made a joint decision to put Holliday under a Prevention Plan, and they consulted multiple times throughout the investigation. Sneed also refused to lift the Plan's restrictions despite evidence that AH was safe. Instead, Sneed deemed it advisable to keep Holliday under supervised contact with AH for two weeks and prevent close family from watching AH for three months. Sneed's conduct is therefore sufficient for purposes of liability under § 1983.

1.  **Substantive Due Process**

While procedural due process principles protect persons from deficient procedures that lead to the deprivation of cognizable liberty interests, substantive due process provides that, irrespective of the constitutional sufficiency of the processes afforded, government may not deprive individuals of fundamental rights unless the action is necessary and animated by a compelling purpose. *Mathews v. Eldridge*, 424 U.S. 319, 333-34 (1976); *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).

The touchstone of substantive due process is the protection against arbitrary governmental action, including "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998) (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). "While due process protection in the substantive sense limits what the government may do in both its legislative, *see*, *e.g., Griswold v. Connecticut,* 381 U.S. 479 (1965), and its executive capacities, *see*, *e.g., Rochin v. California,* 342 U.S. 165 (1952), criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue." *Lewis*, 523 U.S. at 847.

This case challenges executive action (i.e., the imposition of a restrictive prevention plan), not legislation. The Supreme Court has said "that the substantive component of the Due Process

Clause is violated by executive action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *Lewis*, 523 U.S. at 847 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 128 (1998)); *but see Pittman.*, 640 F.3d at 728 n.6.[1]

"[T]he Supreme Court has repeatedly reaffirmed the existence of a constitutional right to the maintenance of a parent-child relationship." *Kottmyer v. Maas,* 436 F.3d 684, 689 (6th Cir. 2006). The right encompasses the right of parents to "make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66. But that right is neither absolute nor unqualified. *Kottmyer*, 436 F.3d at 690. Instead, it "is limited by an equal[ly] compelling governmental interest in the protection of children, particularly where the children need to be protected from their own parents." *Id.* As a result, "the right to familial association is not implicated merely by governmental investigation into allegations of child abuse." *Id.* And such investigations will not infringe on a family's fundamental rights absent evidence of bad faith, improper motive, or investigation tactics that shock

---

[1] The Sixth Circuit used a different and less stringent test in *Pittman*. And the Circuit acknowledged the use of different methods of analysis in *Schulkers v. Kammer,* 955 F.3d 520, 544 n.5 (6th Cir. 2020), but it declined to resolve the issue because it determined that the conduct would have been unconstitutional under either standard.

the conscience. *Id.* at 691 & n. 1; *see also Teets v. Cuyahoga Cty., Ohio*, 460 F. App'x 498, 501-02 (6th Cir. 2012).

A reasonable jury could find that defendants acted with deliberate indifference. Holliday contends that she signed the Prevention Plan under protest because Leigh threatened to take AH into custody immediately. That threat amounts to duress. While it is not duress to threaten to exercise a legal right in good faith, Leigh knew she had neither legal authority to remove AH herself nor legal grounds to pursue removal. To obtain an emergency custody order and remove AH from Holliday's care, defendants, under Kentucky law, would have needed to provide sworn testimony to a judge which showed both that removal was in AH's best interest and that there were reasonable grounds to believe that AH was either being sexually abused or in imminent danger of death or serious physical injury if she were left in her mother's care. *See* Ky. Rev. Stat. Ann. § 620.060.

Defendants had neither provided sworn testimony to a judge nor signed an affidavit. There were no plans to pursue an emergency order. And at the time Leigh allegedly threatened Holliday with immediate removal, the faint bruising and the daycare report did not provide reasonable grounds to believe that AH was in imminent danger of Holliday inflicting a severe physical injury upon AH or that Holliday was sexually abusing her or failing to protect her from sexual abuse. While defendants had a daycare worker's report

16

stating that the bruise did not look like a child's bitemark, they also knew that AH had been consistent in claiming that Lola had bitten her.

But despite AH's consistent explanation, defendants unilaterally determined that Holliday was unfit to care for her child. Defendant Leigh allegedly threatened to immediately remove AH and thus coerced Holliday into signing a Plan that contained no indication that compliance was voluntary and twice stated that foster care was the plan for AH should Holliday fail to comply. Defendants put Holliday in the position where she felt that she had no reasonable alternative but to sign the Plan and comply with its restrictions.

A prevention plan that bars the child from being alone with her mother and close family curtails the mother's right to make decisions concerning the child's care. *See Schulkers v. Kammer*, 955 F.3d 520, 540-41 (6th Cir. 2020). And forcing a parent to sign such a plan under duress, with knowledge that she is a single mother, and telling her to "figure it out" when she expresses concerns, displays deliberate indifference to the parent's fundamental right to make decisions concerning the care and control of her child and shocks the conscious. Leigh knew that Holliday was a single mother who lived on her own and that she relied upon her family for help with AH, yet she coerced Holliday into signing a Plan that immediately disrupted her life. Since the agreement

restricted Holliday's and her family's contact with AH, she had to turn to a distant relative to comply with the Plan's supervision requirement. Although these curtailments of parental rights were less extreme than removing AH from Holliday's custody and placing AH in foster care, they were invasive enough to constitute a deprivation of a fundamental right. *See Dupuy v. Samuels,* 465 F.3d 757, 760 (7th Cir.2006) (alluding to fact that prevention plans could violate due process rights).

Where social workers are afforded a reasonable opportunity to deliberate various alternatives before deciding on a course of action, their actions will be deemed conscience shocking if they were taken with "deliberate indifference" towards the plaintiff's federally protected rights. *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000) (citing *Lewis*, 523 U.S. at 852-53); *see also Farley v. Farley,* Nos. 98-6114, -6115, 2000 U.S. App. LEXIS 17580, at *4 (6th Cir. July 19, 2000).

Deliberate indifference requires that the officials knew of facts from which they could infer a substantial risk of serious harm, that they did infer it, and that they acted with indifference toward the individual's rights. *Range v. Douglas*, 763 F.3d 573, 590 (6th Cir. 2014). More than negligence is required to satisfy the deliberate indifference standard. The conduct must be that "which is 'intended to injure' without any justifiable government interest" or at the very least, in appropriate cases, the actions

must reflect "recklessness or gross recklessness" and offend traditional notions of fair play and decency. *Lewis,* 523 U.S. at 846-49.

Here, there was no compelling purpose to impose such restrictions on Holliday. *See Croft v. Westmorland Cty. Children and Youth Servs.,* 103 F.3d 1123 (1997). *Croft* involved a child abuse investigation that started after social workers received an anonymous report that a father had sexually abused his daughter. *Id.* at 1124-25. The investigating social worker secured the father's compliance with a prevention plan by issuing an ultimatum to immediately have his child removed from the home and placed in foster care. *Id.* The plan's restrictions forced the father from his home and would not allow him to be alone with his daughter. *Id.*

While recognizing that states have an interest in preventing child abuse, the Third Circuit found the social worker's threat problematic because at the time she made it, she did not have a legal basis for removing the child from the home, i.e., she did not have objectively reasonable grounds to believe the father was sexually abusing the child and thereby could not have obtained an emergency custody order. *Id.* at 1125-27. She lacked a reasonable basis because her initial interviews, like the interviews here, failed to corroborate the details of the report. *Id.* The Third Circuit held that the baseless threat was an arbitrary abuse of

government power and that the prevention plan impermissibly interfered with the father's fundamental right to familial integrity. *Id.* at 1127.

Leigh and Sneed's investigation went beyond unfounded ultimatums. Defendants kept Holliday under the Plan's restrictions despite mounting evidence that AH was safe. That evidence began accumulating when Holliday took AH to Cincinnati Children's Hospital soon after leaving the daycare. AH told the doctors at Cincinnati Children's that Lola had bitten her, and the doctors reported that the marks were consistent with that explanation. An examining social worker said that no additional social work intervention was needed. Leigh learned of these conclusions when she called the hospital that night. Leigh nevertheless declined to return Holliday's phone calls. At that point, the restrictions forced Holliday and AH to move out of their home.

In the face of this information, defendants decided to keep Holliday under the restrictions and continued their investigation. In the process, Leigh continued to conduct interviews and continued to collect nothing but exonerating evidence. Holliday testified that she protested the Plan's restrictions from the start, but Leigh was nonresponsive to her concerns and simply plugged along with the investigation. After twelve days of ER visits, interviews, and consults between Leigh and Sneed, defendants decided to lessen the restrictions on Holliday. While that eased some of the burden,

defendants then enacted another Plan that still prevented Holliday from leaving AH alone with much of her close family and thereby continued to impinge upon her right to make decisions concerning the care, custody, and control of her daughter.

Leigh continued to conduct interviews for three more weeks, with none revealing evidence of abuse. The case then sat cold for a month with Holliday in the dark and the restrictions still in place. While Leigh and Sneed insist that they were waiting to obtain a consult from Dr. Shapiro at the Mayerson Clinic, Holliday claims that she was never told that this was the reason the investigation could not be closed and testified that she would have taken AH to the clinic herself had she known.

In late December, Mayerson said it was not going to issue a written report because Dr. Shapiro had not evaluated AH in person. Leigh then submitted her final report on December 28, with a statement that Dr. Shapiro had described one of the bruises as a linear mark, a statement that is absent from her contemporaneous summary of a call with Dr. Shapiro several weeks earlier. Sneed approved the final report on January 4, yet Holliday continued to live under the Plan's restrictions until January 13, the date Leigh finally notified her that the case had been closed.

While the supervision restrictions did not deprive Holliday of the physical companionship of her child, they nevertheless constituted an interference with the natural "parent-child

relation." *Kottmyer*, 436 F.3d at 689. By arbitrarily mandating when Holliday could be with her child and who else would have to be present, the Plan abridged Holliday's due process right to family integrity under *Troxel* and contravened "the traditional presumption" articulated by the Supreme Court in *Troxel* "that a fit parent will act in the best interest of his or her child." *Troxel*, 530 U.S. at 69; *see also Schulkers v. Kammer*, 955 F.3d 520, 541-42 (6th Cir. 2020). Consequently, a reasonable jury could find that defendants acted with deliberate indifference towards Holliday's right to make decisions concerning the care, custody, and control of her daughter as it is not a stretch to say that their investigation tactics were arbitrary and reckless and therefore violated traditional notions of fair play and decency.

This right was also clearly established. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what [she] is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam). While a case "directly on point" is not required, existing precedent must have placed the constitutional question beyond debate. *Kisela v. Hughes*, 138 S. Ct. ,1148 1152 (2018) (per curiam); *Mullenix*, 136 S. Ct. at 308; *al-Kidd*, 563 U. S. at 741. The contours of the right at issue are "beyond debate" if there exists "either controlling authority or a robust consensus of cases of persuasive authority" that clearly define the contours of the

right. *See Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (citations and internal quotations omitted). However, general statements of the law can give fair and clear warning where a constitutional rule already identified in the decisional law applies with obvious clarity to the conduct in question. *United States v. Lanier*, 520 U.S. 259, 271 (1997).

Defendants' conduct strikes at the heart of Holliday's right to make decisions concerning the care, custody, and control of her child. While mere investigations into allegations of child abuse do not implicate that right, implementing restrictive prevention plans and using baseless threats to secure and ensure compliance do, and it has been so for several years.

Numerous Supreme Court cases have found that a parent has a fundamental right to "the companionship, care, custody and management of his or her children," *Lassiter*, 452 U.S. at 27, and that "so long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel*, 530 U.S. at 68-69. Thus, defendants are not entitled to qualified immunity on Holliday's substantive due process claim.

## 2.   Procedural Due Process

Three factors guide the inquiry into whether Holliday's recognized liberty interest in making decisions concerning the care custody and control of her children received adequate procedural due process protection: first, courts consider the private interest affected by the official action; second, courts consider the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, courts consider the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail. *Matthews v. Eldridge*, 424 U.S. 319, 335 (1876).

The Sixth Circuit has long recognized that an analysis of the above factors leads to the conclusion that "notice and opportunity to be heard are necessary before parental rights can be terminated." *Anh v. Levi*, 586 F.2d 625, 632 (6th Cir. 1978). Although the curtailments of parental rights at issue here are less extreme than removing the child from parental custody, "they may be invasive enough to count as a deprivation of liberty, thus triggering the right to a hearing" or other procedural safeguards. *Dupuy*, 465 F.3d at 760.

Appellate courts have found prevention plans procedurally problematic based on facts similar to those of this case. *See*

*Schulkers v. Kammer*, 955 F.3d 520, 542-49 (6th Cir. 2020). While it is not improper to threaten legal actions one has the right to take, securing compliance with a prevention plan by making unfounded and unenforceable threats can amount to an unconstitutional circumvention of procedural protections. Leigh had no authority to leave with A.H. immediately and possessed no grounds for even pursuing that as an option. This situation is comparable to the one in *Croft* where the social worker made a threat to pursue immediate removal when she had only shaky evidence that the child was being sexually abused and thus had no reasonable belief that she could make good on her ultimatum to remove the child by pursuing an emergency custody order.

The involuntary imposition and maintenance of prevention plans can also result in an unconstitutional deprivation of procedural process. In *Smith v. Williams-Ash*, 520 F.3d 596 (6th Cir. 2008) ("*Smith II*"), the Sixth Circuit concluded that a social worker was entitled to qualified immunity when the prevention plan at issue stated that adherence to the plan, which prevented the children from staying in their parents' dangerously dirty house, was voluntary. The Sixth Circuit had reached a different conclusion and had denied qualified immunity when the case was first before it. In *Smith v. Williams-Ash*, 173 F. App'x 363 (6th Cir. 2005) ("*Smith I*"), the district court denied qualified immunity and the Sixth Circuit affirmed because based on the record and allegations

in the complaint, it appeared that the plaintiffs had expressed opposition to the plan and had never consented to the restrictions. *Id.* at 366-67. The change in decision from *Smith I* to *Smith II* suggests that consent and evidence that consent was voluntary are key factors in determining whether a parent's due process rights were violated.

Impingements on a parent's right to make decisions concerning the care and control of her child imposed over objection and maintained with no clear procedural redress are unconstitutional deprivations of procedural due process. *See Smith II*, 520 F.3d at 600 (citing *Dupuy*, 465 F.3d at 761-62). On a fully developed record in *Smith II*, the Sixth Circuit found that the defendant social worker had persuaded the plaintiffs to voluntarily consent to the safety plan. The plan in question told the parents, in writing, that their "decision to sign this safety plan [was] voluntary . . . ." *Id.* In contrast, the Plan Holliday signed contained no indication that it was a voluntary agreement, she protested before she signed it, and she contends that she only signed it because Leigh threatened to immediately take AH. Unlike *Smith II*, there is a genuine issue of material fact as to whether Holliday's consent was voluntary. *See Schulkers v. Kammer*, 955 F.3d 520, 542-43 (6th Cir. 2020).

Further, the *Smith II* court also found that the plaintiffs voluntarily remained in compliance with the safety plan because

they admitted they never attempted to use the plan's "clear, simple mechanism for rescinding . . ." *Id.* at 761. The *Smith II* plan indeed told the plaintiffs, in writing, that they must contact the case worker immediately if they decided that they could not or would not be able to abide by the plan's terms. The Plan Holliday signed contained no such notice and failed to provide Holliday with a procedural road map for how to obtain relief from its restrictions.

Holliday had no notice of her rights. She had no notice that her consent should be voluntary, and defendants gave her no means to contest their actions. Accordingly, a reasonable jury could conclude that defendants violated Holliday's constitutional right to procedural due process when they allegedly coerced her into agreeing to the restrictions and then maintained the restrictions despite her protests.

While the state certainly has an interest in preventing child abuse, that interest does not permit social workers to circumvent the procedural protections afforded by state law, e.g., reasonable cause requirements and mandated hearings. Leigh, under Sneed's guidance, put Holliday under a Prevention Plan that impinged her right to make decisions concerning the care, custody, and control of her daughter and maintained those restrictions for an unnecessarily long time period. Unlike the plan in *Smith II*, the Plan here contained no indications that consent and compliance

were voluntary, and because of a large stamp at the bottom, the Plan implied that foster care was the immediate alternative to compliance. Further, the defendants left the restrictions in place despite Holliday's requests and cooperation.

A reasonable jury could thus find that defendants' conduct violated a clearly established procedural right. As *Troxel* indicates, the right to make decisions concerning the care, custody, and control of a child encompasses the right to make decisions concerning who the child spends time with. *Troxel*, 530 U.S. at 66-70. The above-mentioned cases (*Croft*, *Smith I*, and *Smith II*) establish that a social worker cannot impose such significant restrictions under duress and then maintain them in light of protest without offering procedural safeguards. In *Smith II*, the Sixth Circuit echoed a principle articulated in *Dupuy v. Samuels* and stated that "when a parent voluntarily consents to a safety plan, 'no hearing of any kind is necessary; hearings are required for deprivations taken over objection, not for steps authorized by consent.'" *Smith II*, 520 F.3d at 600. That principle and the cases discussed above have been around for several years. And in two of the cases (*Smith I* and *Farley*), the Sixth Circuit found that the procedural rights at issue were clearly established rights in 2000 and 2005 respectively and denied qualified immunity. Accordingly, Holliday has provided sufficient evidence to show that defendants violated her clearly established right to procedural due process.

**B.    Intentional Infliction of Emotional Distress**

Kentucky law recognizes the tort of outrageous conduct, also known as intentional infliction of emotional distress ("IIED"). *Craft v. Rice*, 671 S.W.2d 247, 249 (Ky. 1984). The Kentucky Supreme Court has adopted Section 46(1) of the Restatement (Second) of Torts, which provides that "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress. . . ." *Craft*, 671 S.W.2d at 251. In recognizing the tort of IIED, the Kentucky Supreme Court adopted a cause of action "for severe emotional distress, caused by truly outrageous behavior, where there was no remedy because the victim did not have an injury directly to his person or intangible personal attributes such as reputation." *Childers v. Geile*, 367 S.W.3d 576, 581 (Ky. 2012).

Generally speaking, IIED is a "gap-filler tort." *Childers*, 367 S.W.3d at 581. That is, "[w]here the alleged conduct makes out a claim for another tort for which emotional distress damages are available, IIED is not a valid cause of action. . . ." *Farmer v. Dollar Gen. Corp.*, No. 4:11-CV-00027-JHM, 2012 WL 4364108, at *7 (W.D. Ky. Sept. 24, 2012); *Banks v. Fritsch*, 39 S.W.3d 474, 481 (Ky. Ct. App. 2001) (affirming a directed verdict for defendant on intentional infliction claim where plaintiff could potentially recover emotional damages arising from false imprisonment, assault, or battery). In rare occasions, an IIED claim can stand

alone—but only if the alleged conduct was "intended only to cause extreme emotional distress in the victim." *Brewer v. Hillard*, 15 S.W.3d 1, 8 (Ky. Ct. App. 2000). Accordingly, a plaintiff generally cannot maintain an IIED claim if another tort also contemplates the emotional damages she seeks. *Walden v. Pryor*, No. 5:18-CV-171-TBR, 2019 WL 2441838, at *8 (W.D. Ky. June 11, 2019).

Borrowing the logic of the "gap-filler" argument, defendants insist that Holliday's IIED claim should be dismissed because she can recover emotional distress damages if her § 1983 claims succeed. But defendants' argument distorts the reasoning underlying the gap-filler rationale and overextends it. Kentucky courts, and federal courts interpreting Kentucky law, tend to dismiss IIED claims when a plaintiff pleads another tort such as assault, battery, or malicious prosecution that provides essentially the same recovery, i.e., instances where IIED is a tag-along state-law claim. This practice of dismissing tag-along claims helps cabin IIED claims to instances where the plaintiff has suffered emotional distress due to conduct that does not also cause a physical injury or an injury to the plaintiff's reputation. That is, IIED fills the gap.

But some courts have also dismissed IIED claims when they are brought alongside Title VII and § 1983 claims. *See Walden,* 2019 WL 2441838, at *8; *Farmer*, 2012 WL 4364108, at *7. The reasoning underlying those decisions should not, however, be extended to

30

this case. The primary issue with extending the gap-filler argument
to cover a case like this one is that Holliday's due process claims
could fail due to a grant of qualified immunity or for other legal
reasons irrelevant to her IIED claim. Hypothetically, actions
taken in bad faith could cause severe emotional distress even
though they fail to offend a clearly established constitutional
right or be undertaken by someone who a court decides is not a
state actor. In other words, a plaintiff's § 1983 claims could
fail, and the plaintiff still recover for IIED. Here, Holliday's
IIED claim is not inextricably bound up in her succeeding on her
constitutional due process claims. The latter could fail for
reasons that do not apply to the former.

To prevail on her IIED claim, Holliday must establish that:
(1) the wrongdoer's conduct was intentional or reckless; (2) the
conduct was outrageous and intolerable such that it offends
generally accepted standards of decency and morality; (3) there is
a causal connection between the wrongdoer's conduct and the
emotional distress; and (4) the emotional distress caused was
severe. *Andrew v. Begley*, 203 S.W.3d 165, 173 (Ky. Ct. App. 2006)
(citing *Kroger Co. v. Willgruber*, 920 S.W.2d 61, 65 (Ky. 1996)).

Here, the above analysis shows that the conduct in question
could reasonably be considered reckless, and Holliday has provided
medical records from her counselor showing that the defendants'
actions caused severe emotional distress. (Doc. 44-2). Thus, the

only legal issue at this juncture is whether the conduct alleged was outrageous and intolerable. *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 806 (6th Cir. 1994) ("It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery.") (quoting Restatement (Second) of Torts § 46 cmt. n.(h) (1965)); *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 788-89 (Ky. 2004).

Making material misrepresentations in order to coerce someone into making life-altering decisions can constitute outrageous and intolerable conduct. In *Kroger Co. v. Willgruber*, the plaintiff's employer "engaged in a calculated attempt to coerce him to sign release papers exonerating [it] for its wrongful discharge of [plaintiff]." 920 S.W.2d at 66. The coercion was the product of the employer "misrepresent[ing] to [plaintiff] that he would be eligible for another position, knowing full well that no such position was available." *Id.* The court found that a reasonable jury could conclude that the defendants had orchestrated a plan of attempted deceit and interference with contractual rights in a carefully designed attempt to make plaintiff relinquish his rights. *Id.* at 67.

Here, like in *Willgruber*, defendant Leigh allegedly misrepresented her legal authority by stating that she would take AH into custody immediately. She is alleged to have made that

threat in order to coerce Holliday into signing the Prevention Plan, all while knowing full well that a social worker cannot immediately take a child in AH's position into state custody. In light of AH's consistent story that Lola had bitten her at daycare, she also harbored no objectively reasonable belief that AH was in imminent danger of severe physical injury or was being sexually abused, meaning that she could not have obtained an emergency custody order even if she had sought one. Because Holliday's access to her child was restricted, she was forced to become transient, and her and AH's sense of home and stability disintegrated as a result of being placed under the Plan. Holliday alleges she informed defendants of these hardships and that they ignored her concerns because defendants maintained the restrictions despite evidence that AH was safe. Defendants' conduct is on par with the coercion deemed outrageous in *Willgruber*. *Id.* at 67. Therefore, a jury could conclude that defendants' investigation was taken with deliberate indifference towards Holliday and AH's needs and was thus outrageous and intolerable. Accordingly, Holliday's IIED claim will not be dismissed.

Defendants are also not entitled to state-law qualified immunity. "Qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, i.e., those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment[;]

(2) in good faith; and (3) within the scope of the employee's authority." *Knott Cty. Bd. of Educ. v. Patton*, 415 S.W.3d 51, 57 (Ky. 2013) (quoting *Yanero v. Davis*, 415 S.W.3d 510, 522 (Ky. 2001)). In contrast, an officer does not enjoy immunity from tort liability "for the negligent performance of a ministerial act, i.e., one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.* (citation omitted).

The parties do not dispute that defendants were acting in the scope of their authority. Thus, the critical inquiry at this point involves the "function performed," not the "status or title of the officer." *Yanero*, 415 S.W.3d at 521. This requires "a more probing analysis than may be apparent at first glance" because "few acts are ever purely discretionary or purely ministerial." *Haney v. Monskey*, 311 S.W.3d 235, 240 (Ky. 2010). As such, courts look to "the dominant nature of the act." *Id.*

Defendants' actions were discretionary. Child abuse investigations entail "certain mandated statutory requirements as to who shall be interviewed, etc., but they also involve discretionary decisions by the case workers, just as in police investigations." *Stratton v. Commonwealth*, 182 S.W.3d 516, 521 (Ky. 2006). Thus, while there are procedures in place, the decision to implement a safety plan, choosing the restrictions to put in

said plan, and the decision to continue an investigation are predominately discretionary functions.

Once the defendants have shown *prima facie* evidence "that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff." *Yanero*, 65 S.W.3d at 523. By direct or circumstantial evidence, the plaintiff must then establish that the discretionary act was performed in bad faith, rather than good faith. *Rowan Cty. v. Sloas*, 201 S.W.3d 469, 481 (Ky. 2006). As the *Yanero* court explained, "if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive," he acted in bad faith. *Yanero*, 65 S.W.3d at 523; *Autry v. Western Kentucky Univ.*, 219 S.W.3d 713, 717 (Ky. 2007).

But a showing of bad faith can also be founded on a violation of a clearly established constitutional right, i.e., situations where the official acted with objective unreasonableness. *Yanero*, 65 S.W.3d at 523; *Sloas*, 2001 S.W.3d at 481. The same "objective reasonableness test" utilized in federal § 1983 actions, applies under Kentucky's qualified official immunity doctrine. *See Yanero*, 65 S.W.3d at 523. Given that the above analysis finds that defendant's actions violated a clearly established constitutional right, defendants are not entitled to state-law qualified immunity for the same reasons.

C.     **Punitive Damages**

Punitive damages are available in actions under 42 U.S.C. § 1983 when the defendant's conduct "is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56 (1983). Conduct that rises to the level of deliberate indifference necessary to establish liability under § 1983 does not necessarily rise to the level of "callous indifference" that warrants punitive damages. [2]  *See id.; Gibson v. Moskowitz*, 523 F.3d 657, 664 (6th Cir. 2008) (citing *Coleman v. Rahija,* 114 F.3d 778, 787 (8th Cir. 1997)). Thus, even where there is sufficient factual support to raise a genuine issue of material fact with respect to liability under § 1983, it does not follow that such factual support exists for an instruction on punitive damages.

Since § 1983 "presupposes that damages that compensate for actual harm ordinarily suffice to deter constitutional violations," it follows that punitive damages should be permitted

---

[2] Kentucky uses an even more stringent test for punitive damages. Under Ky. Rev. Stat. § 411.184, punitive damages are limited to situations involving oppression (requires intent to subject to cruel and unjust hardship), fraud (requires intent to cause injury), or malice (requires subjective awareness that conduct will result in death or bodily harm).

only in particularly egregious situations. As a threshold, a defendant's misconduct must be determined "sufficiently serious" in order to trigger the availability of punitive damages. *See Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 310 (1986); *Coleman*, 114 F.3d at 787. In the present case, the evidence does not suggest that defendants' conduct was so egregious that it cannot be remedied by compensatory damages.

Though defendants interfered with Holliday's right to make decisions concerning the care, custody, and control of her daughter, and did so with deliberate indifference, it is difficult to argue that their actions and decisions were taken with callous indifference. Defendants did not completely bar Holliday from seeing her daughter, and they eased the most onerous restrictions two weeks after the investigation started.

Courts have denied claims for punitive damages where a defendant has acted in a more egregious manner. In *Webb v. Jessamine Cty. Fiscal Court*, No. 5:09-CV-314-JMH, 2011 WL 3847454, (E.D. Ky. Aug. 26, 2011), the district court dismissed a plaintiff's claim for punitive damages where the plaintiff went into labor in the jail and complained of pain and other symptoms, including the "breaking of her water." *Id.* at *1. The jail supervisor waited eight hours to call for medical services. *Id.* While the court concluded that the defendant may have acted with deliberate indifference, it found no evidence that the defendant

was motivated by evil intent or callous indifference. *Id.* Considering this elevated and difficult-to-meet standard, Holliday cannot show that she is entitled to punitive damages. Consequently, her claim for punitive damages is dismissed.

### III. <u>CONCLUSION</u>

For the reasons above, defendants' motions for summary judgment with regards to Holliday's substantive and procedural due process claims, as well as her IIED claim, are **DENIED** as defendants are not entitled to qualified immunity. (Docs. 39, 40). Defendants motions for summary judgment are, however, **GRANTED** with respect to Holliday's claim for punitive damages as Holliday cannot show that defendants acted with callous indifference.

So ordered this 15th of June 2020.



Signed By:

<u>*William O. Bertelsman*</u> *WOB*

**United States District Judge**